**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **WILLIAM J. GRUVER and** | ) | |
| **ROBERTA LYNN GRUVER,** | ) | |
| | ) | |
| **Debtors.** | ) | **Case No. 1:20-cv-229-SPB** |
| -------------------------------------------------- | ) | |
| | ) | |
| **WILLIAM K. GRUVER and** | ) | |
| **ROBERTA LYNN GRUVER,** | ) | **Bankruptcy Case No. 16-10241-TPA** |
| | ) | |
| **Plaintiffs,** | ) | **Adversarial Proceeding No. 18-1025-GLT** |
| **v.** | ) | |
| | ) | |
| **ROBERT KINCAID and FIRETECH,** | ) | |
| **THE FIRE TECHNOLOGY PEOPLE,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

### I.    INTRODUCTION

Plaintiffs William K. and Roberta Lynn Gruver ("Plaintiffs" or the "Gruvers") are debtors in a Chapter 13 case proceeding in the United States Bankruptcy Court for the Western District of Pennsylvania at Case No. 16-10241-TPA.  In November, 2016, the Gruver suffered a catastrophic fire at their home in Hartstown, Pennsylvania.

Thereafter, they hired FireTech, the Fire Technology People, Inc. ("FireTech") to remediate the damage and restore their house.  A series of events led to disagreements about the cost and scope of anticipated repairs, which culminated in FireTech abandoning the project before repairs were completed.

1

Plaintiffs subsequently filed this adverse action against FireTech and its president, Robert "Randy" Kincaid[1] (collectively, "Defendants") alleging, among other things, breach of contract and violation of Pennsylvania's consumer protection laws.  In May 2019, United States Bankruptcy Judge Gregory L. Taddonio presided over a three-day bench trial.  Because Judge Taddonio viewed the Gruvers' lawsuit as a non-core proceeding that was "related to" their underlying bankruptcy case, and because the parties did not unanimously consent to the Bankruptcy Court entering a final order, Judge Taddonio issued an extensive Memorandum of Proposed Findings of Fact and Conclusions of Law.  Both Plaintiffs and Defendants filed objections to Judge Taddonio's proposed findings and conclusions.  In addition, both Plaintiffs and Defendants filed responses to the other side's objections.

The Court now issues this Memorandum Opinion, in which it adopts the Bankruptcy Court's proposed findings of fact and conclusions of law and addresses various objections raised by the parties.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The background facts underlying this dispute have been outlined in great detail by the Bankruptcy Court in its Memorandum of Proposed Findings of Fact and Conclusions in Law. After *de novo* review, the undersigned finds the Bankruptcy Court's proposed factual findings to be cogent, balanced, thorough, and well supported by the record, and adopts those proposed findings as its own.  A summary of the relevant factual and procedural background follows.

---

[1] This Court's docket incorrectly identifies FireTech's co-Defendant as Ryan Kincaid (who is FireTech's operations manager and Randy Kincaid's son). The Clerk is requested to correct this inaccuracy.

A.  *Factual Background*

On Thanksgiving Day of 2016, the Gruvers suffered a catastrophic house fire, which rendered their home inhabitable.  At the time, they were insured against the loss by MetLife Auto and Home ("MetLife").

In January 2017 the Gruvers and FireTech executed an "Agreement for Demolition, Fire Remediation, and Restoration."  *See* Trial Ex. BB.  Under the contract, FireTech agreed "to perform all the work set forth in the work description attached hereto and incorporated herein as Exhibit 'A.'"  *Id.*, ¶1. FireTech also agreed to "negotiate with the Owner's insurer [*i.e.*, MetLife], insurance adjuster, and mortgagee . . . with regard to the work set forth in Exhibit 'A.'"  *Id.*

Exhibit "A" to the contract is a 26-page itemization of estimated damages which identifies, for each room of the house, the necessary building materials or remediation tasks, the quantities required, and a line-item cost, the total of which was $153,171.68.  *See* "Exhibit A" to Trial Ex. BB.  The required materials, tasks, quantities, and costs are delineated in this fashion because, as explained by Ryan Kincaid, FireTech's operations manager, insurance companies like MetLife base their loss settlements on a room-by-room, line-by-line estimate of damages. Adv. Proc. 18-1025-GLT, ECF No. 225 at 43:2-9.  The record reflects that Ryan Kincaid prepared the estimate of damages in Exhibit A, and the estimate was then submitted to and approved by MetLife.  *See* Adv. Proc. 18-25-GLT, ECF No. 248 at 12, n. 60.  As noted, the contract obligated FireTech to negotiate with the homeowner's insurer relative to its work on the project.  At trial, Ryan Kincaid acknowledged his understanding that the work performed by FireTech under the contract would be paid for through insurance proceeds provided by MetLife. *See* Trial Ex. BB, ¶1; Adv. Proc. 18-1025-GLT, ECF No. 225 at 71:11-13, 95:25-96:2.  In fact, under Paragraph 6 of the contract, the Gruvers assigned "any and all claims to FireTech that

3

[they had] with their insurer as a result of the damages to the Premises." Trial Ex. BB, ¶6. Thus, the availability of insurance coverage was central to the contract and the parties' expectations.

Consistent with that understanding, the "Contract Sales Price" was initially set at $153,171.68 -- the total estimated damages contained in Exhibit A. Still, the contract made clear that the agreed upon sales price was a "lump sum contract price for all services," and "[a]ny per item cost breakdown . . . [was] for informational purposes only." Trial Ex. BB, ¶7. The agreement terms also contemplated that the sales price might change and that "[a]ny additions or changes to the services as set forth herein and in Exhibit 'A' [would] result in an additional fee to the Owner with said fee including applicable overhead and profit charges." Trial Ex. BB, ¶4. Ryan Kincaid testified that supplemental damage estimates are common in FireTech's line of business due to "damages that we can't foresee at the start of the loss that tend to crop up as the project goes on." Adv. Proc. 18-1025-GLT, ECF No. 225 at 45:23-25. He concluded that a supplemental damages estimate was "almost assured" in the Gruvers' case, given the size of their loss, and he told the Gruvers as much. *Id*. at 45:16-25; 71:1-10.

Restoration of the Gruvers' home began in late March 2017. Randy Kincaid was responsible for the actual construction phase of the project and controlled the schedule of the repairs. Unfortunately, problems arose during the course of FireTech's performance, owing largely to the fact that FireTech's scope of work was contractually defined in terms of Exhibit A to the agreement, rather than by more comprehensive blueprints or drawings. Rather than operating off an established blueprint, Randy's practice was to draw what he wanted done on a wall or floor and then convey the design to the Gruvers orally or by reference to another exemplar home. Adv. Proc. 18-1025-GLT, ECF No. 248 at 20.

Even more problematic was Randy's apparent disregard of the scope of work set forth in Exhibit A to the contract.  As is described in great detail by the Bankruptcy Court and borne out by the record, Randy's approach to the project was "seemingly untethered to the insurance estimate," Adv. Proc. 18-1025-GLT, ECF No. 248 at 20, in that Randy:  (i) was uninvolved in negotiations with MetLife's adjuster and uninformed about the limits of available coverage; (ii) did not pay close attention to the costs of the project; (iii) engaged in certain work outside the scope of "Exhibit A" without knowing how costs would be covered; and (iv) encouraged a practice of "horse-trading" construction tasks or items without documenting the costs or parameters of the trade.  *See id.* at 20-23.  As a result of FireTech's rampant practice of horse-trading, the damage estimate set forth in Exhibit A "ceased to be representative of the project and the lack of transparency meant that only FireTech could know the scope of what it agreed to do." *Id*. at 23.  Over time, what originally started as a restoration project transitioned into a home remodel and upgrade, through FireTech's pervasive horse-trades and promises of supplemental estimates.

During the course of the project, FireTech sent numerous periodic invoices to Plaintiffs, none of which specifically tracked or accounted for the various horse-trades.  On March 24, 2017, FireTech sent its first invoice for payment in the amount of $36,528.73.  Prior thereto, MetLife had released a check for $98,578.08 made payable jointly to Plaintiffs and to Ocwen Home Servicing LLC ("Ocwen"), the company responsible for servicing the Plaintiffs' mortgage.  Ocwen initially paid only $10,000 of FireTech's invoice but then later paid an additional $36,000 (or $9,471.27 above the invoice price) upon order of the Chapter 13 bankruptcy judge.  In the interim, FireTech had discontinued working on the project, but it returned to the job after receiving payment.  FireTech's second invoice for $25,216.06 was paid

by Ocwen on August 21, 2017.  FireTech sent a third invoice in the amount of $35,000 on

November 15, 2017, but this invoice was not paid until February 20, 2018 due to the fact that

Ocwen's check was somehow misplaced and a replacement check had to be mailed.  In the

interim, FireTech had again discontinued work, returning to the project only after the

replacement check was received.  Adv. Proc. 18-1025-GLT, ECF No. 248 at 30-33.

Meanwhile, in November of 2017, Mr. Gruver inquired of Ryan Kincaid whether certain

aspects of the project were not included in the original damage estimate.  Ryan advised Mr.

Gruver to "walk through the estimate, walk through the house, what you don't believe

was in there, jot it down in a notebook and bring it up to the office."  Adv. Proc. 18-1025-GLT,

ECF No. 225 at 46:24-47:1.  Acting on this advice, Mr. Gruver subsequently met with Ryan and

identified "some things that were in fact missing out of the original estimate."  Id. at 47:6-9.

Ryan then walked through the house himself and began drawing up a supplemental damage

estimate by "[t]aking . . . notes and putting them into an estimating system that is accepted by the

insurance carrier."  Id. at 47:15-17.  In total, FireTech's supplement increased the original

damage estimate by $27,786.71.  *See* Trial Ex. EE.

FireTech's submission of the supplemental estimate led to a meeting on December 12,

2017, which was attended by the Gruvers, Randy and Ryan Kincaid, and two agents of MetLife.

During the meeting, the parties inspected the project site and discussed FireTech's proposed

supplemental estimate of damages.  MetLife's claims manager inquired at the conclusion of the

meeting, "If I immediately release a check for $80,000, how quickly will this job be completed?"

to which Randy replied, "60 days."  Adv. Proc. 18-1025-GLT, ECF No. 248 at 35 and n. 243,

244.  MetLife's agents then approved FireTech's supplemental estimate, thereby increasing the

"Dwelling Replacement Cost" (and thus, the contract sales price) to $180,958.39.  As a condition

6

of approval, however, MetLife demanded and obtained a release from the Gruvers of all insurance claims arising from the fire. *See* Trial Ex. FF. MetLife issued the $80,000 payment the next day. *See* Trial Ex. GG.

As previously discussed, FireTech continued its work on the project following payment of its third invoice on February 20, 2018. Nevertheless, on February 27, 2018 FireTech, through Randy Kincaid, sent the Gruvers a letter ostensibly "to enlighten" Ocwen "as to the expectations of this contractor in order to go forward with the balance of the work needed to be completed." Trial Ex. II. The correspondence included the following payment figures:

| | |
|---|---|
| Project Total | $190,000.00 |
| Project 75% Complete to date | 142,500.00 |
| Total Amount Rec'd to date | 96,000.00 |
| Balance Due to Move Ahead With Work | 46,000.00 |
| | |
| BALANCE After Payment | $47,500.00 |

*Id*. As the Bankruptcy Court observed, this correspondence substantially understated the amount that FireTech had actually been paid (*i.e.* $106,216.06). *See* Adv.Proc. 18-1025-GLT, ECF No. 203, ¶3. It also listed the total project cost as $190,000, which was $9,041.61 higher than the adjusted contract sales price of $180,958.39.

Shortly thereafter, on March 5, 2018, FireTech sent the Gruvers a fourth and final invoice demanding payment of $94,000 -- in other words, full payment of the amount that FireTech claimed was still owing on the (now) $190,000 project. *See* Trial Ex. JJ. As with its correspondence, FireTech's final invoice failed to properly account for the total sum that had actually been paid on the project up to that point ($106,216.06). Thus, the final invoice overstated the amount due by more than $10,000.

7

On the same day that FireTech sent its final invoice to the Gruvers, Ocwen disbursed to FireTech the $46,000 that FireTech had previously demanded in its February 27, 2018 correspondence.  *See* Adv. Proc. 18-1025-GLT, ECF No. 203, ¶3.  With that payment, the amount of funds paid to FireTech now totaled $152,216.06, equal to 84% of the adjusted contract sales price.  Adv. Proc. 18-1025-GLT, ECF No. 185 at ¶IV.9.

Nevertheless, on March 9, 2018, Randy Kincaid informed Mr. Gruver that FireTech would abandon work on the project unless arrangements were made to pay the Final Invoice in full.  When payment was not made, FireTech discontinued its work and abandoned the project for the last time on March 23, 2018.  Despite the fact that Ocwen held the full amount of remaining insurance proceeds, and despite the Plaintiffs' contractual assignment of their rights in the proceeds to FireTech, Defendants never attempted to pursue payment directly from Ocwen.

On April 3, 2018, Randy and Ryan Kincaid met with the Gruvers and their bankruptcy attorney to discuss the status of the project.  During this meeting, Randy revealed that the project was "under water" and that he was unwilling to "eat" the cost.  *See* Adv. Proc. 18-1025, ECF No. 248 at 43 and n. 299.  The meeting ended with the threat of litigation, which eventually ensued.

As outlined by the Bankruptcy Court, the Gruvers have been displaced from their home as a result of the unfinished project and have had to make alternative living arrangements for their family.  To that end, they stayed temporarily with friends, in a hotel, in a recreational trailer and shed and, ultimately, in a rental unit that they own.  They testified concerning additional expenses that they incurred along the way, such as costs associated with storing their property and increased heating and sewage costs. The uninhabitable condition of their home is borne out by the numerous photographs included in the trial record.

B. *Procedural History*

1. Pretrial Proceedings

The Gruvers initiated this adversarial proceeding on May 9, 2018. *See* Adv. Proc. 18-1025-GLT. In their operative pleading, the "Second Amended Adversary Complaint" (the "complaint"), they asserted four claims against the Defendants.[2] *See id.*, ECF No. 49. In Count I, they alleged that FireTech breached the contract by failing to complete work on the fire restoration project. In Count II, the Gruvers alleged that Defendants violated Pennsylvania's Home Improvement Consumer Protection Act ("HICPA"), 73 Pa. Stat. §§ 517.1-517.19, and Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. §§ 201-1, *et seq.*, by making false or misleading statements and engaging in deceptive conduct. In Count III, Plaintiffs alleged that the Defendants breached the contract by failing to perform work in a "good and first-class Workmanlike Manner." In Count IV, the Gruvers alleged that Defendants tortiously interfered with the administration of their bankruptcy estate by forcing them to pay project-related costs at the expense of their Chapter 13 plan. *See* Adversarial Proceeding No. 18-1025-GLT, ECF No. 49.

During the ensuing pretrial proceedings, the parties engaged in discovery and undertook an unsuccessful attempt to mediate their dispute. On January 10, 2019, less than one week prior to the pretrial conference, the Gruvers filed a "Motion for a Continuance of Trial and to Reopen Discovery" on Plaintiffs' behalf. *See* Adversarial Proceeding No. 18-1025-GLT, ECF No. 131. At that time, the Gruvers' bankruptcy attorney, John E. Nagurney, Esq., was also representing

---

[2] Other claims were asserted at various points in time against Plaintiffs' mortgagee, Deutche Bank National Trust Company as Trustee, and its mortgage servicer, Ocwen Home Servicing LLC,, but those claims have since been dismissed and need not be discussed further at this time.

them in the instant adversary proceeding.  As partial grounds for their motion, the Gruvers cited

Mr. Nagurney's failure to comply with the disclosure requirements of Federal Rule of Civil

Procedure 26 relative to expert witnesses.  Fearing the potential exclusion of their tentative

expert witness, the Gruvers requested that the Bankruptcy Court reopen discovery so that they

could comply with the requirements of Rule 26(a)(2) and obtain more experienced trial counsel.

The Bankruptcy Court initially denied the motion to reopen discovery but granted a 45-

day continuance of the trial date so that the Gruvers could obtain replacement trial counsel.  On

February 19, 2019, the Gruver's current attorney of record in this proceeding, Aurelius Robleto,

Esq., entered his appearance.  The Bankruptcy Court later granted the Gruvers' motion for

reconsideration concerning the reopening of discovery and allowed a brief extension of the

expert discovery deadline as well as a further continuance of the trial date.

Notwithstanding the Bankruptcy Court's indulgence in this respect, the parties failed to

fully comply with certain aspects of the amended pretrial schedule.  In particular, Plaintiffs failed

to submit their expert reports in accordance with the Bankruptcy Court's February 21, 2019

pretrial order and also failed to timely oppose the Defendants' motion *in limine* requesting

exclusion of the Plaintiffs' anticipated expert opinion testimony.  Consequently, the Bankruptcy

Court issued an order precluding Plaintiffs from offering the opinion testimony of their expert

witnesses at trial.  *See id*. at ECF No. 201, ¶¶2-3.

2.   The Trial and Post-Trial Proceedings

A three-day bench trial was held before United States Bankruptcy Judge Gregory L.

Taddonio on May 21, 22 and 23, 2019.  *See* Adv. Proc. No. 18-1025-GLT, ECF Nos. 205, 224,

225, 226.  During the trial, the Bankruptcy Court heard testimony from five witnesses:  Mr.

Gruver, Mrs. Gruver, John McFee (a carpenter who was subcontracted by FireTech and briefly worked on the Gruvers' home restoration project), Ryan Kincaid, and Randy Kincaid. At the conclusion of the Plaintiffs' case, the Bankruptcy Court entered an order dismissing the claim against Randy Kincaid in Count IV of the complaint for alleged tortious interference with the administration of Plaintiffs' bankruptcy estate, as the court found no basis in the record to support Randy's personal liability on that count.

At the conclusion of the trial, the parties entered into a stipulation regarding the timing and amount of FireTech's invoices and Ocwen's payments, which was later memorialized in writing. *See* Adv. Proc. No. 18-1025-GLT, Trial Tr. Vol. II, ECF No. 225, at 172:19-173:11; *see also id.* at ECF No. 203. The Bankruptcy Court heard oral argument on Defendants' renewed motion for a directed verdict and accepted post-trial briefs. *Id.*, Trial Tr. Vol. III, ECF No. 226; *see also id.* at ECF Nos. 233-237. Plaintiffs sought leave to add an additional claim against the Defendants based on alleged violation of the automatic stay, but the Bankruptcy Court rejected that request. *Id.* at ECF Nos. 206 and 222.

On July 12, 2019, Defendants filed a renewed motion to dismiss the adverse action on the grounds that the Bankruptcy Court lacked subject matter jurisdiction over the within adversary proceeding. Adv. Proc. No. 18-1025-GLT, ECF No. 228. Defendants argued that the Plaintiffs' claims are "non-core" proceedings that are not "related to" the bankruptcy proceeds because the outcome of the litigation will not impact the Gruvers' bankruptcy estate. Defendants reasoned that, after confirmation of a plan, the court's "related to" jurisdiction is greatly reduced, and the Gruvers' Chapter 13 plan does not call for the proceeds of the adversary proceeding to fund their obligations under the plan. *Id.* Plaintiffs filed their opposition to the motion on August 2, 2019. *Id.*, ECF No. 238.

After hearing argument, the Bankruptcy Court denied Defendants' motion.  Adv. Proc.

18-1025-GLT, ECF No. 245.  As Judge Taddonio subsequently explained,

> [t]he Court agreed that Counts I, II, and III were non-core proceedings under 28 U.S.C. § 157, but theorized that Count IV could potentially be core.  In any event, "[a] bankruptcy judge may *hear* a proceeding that is" non-core so long as it "is otherwise related to a case under title 11." [ ] Relying on *Halper v. Halper*, the Court considered whether the outcome of the adversary "proceeding could *conceivably* have any effect on the estate being administered in bankruptcy" to determine whether it had "related to" jurisdiction.[ ]  Turning to the case at hand, the Court concluded that the causes of action all arose out of the reconstruction of the Gruvers' home, which is presumed necessary for their reorganization,[ ] and that any potential recovery on those claims would both be property of the estate[ ] and essential to curing the plan arrearage.[ ]  Accordingly, the court found the adversary proceeding related to the Gruvers' chapter 13 case and denied the *Renewed Motion to Dismiss*.[ ]

Adv. Proc. No. 18-1025-GLT, ECF No. 248 at 71-72 (emphasis in the original) (footnotes with

citations omitted).

### 3.   Proposed Findings of Fact and Conclusions of Law

On June 19, 2020, the Bankruptcy Court issued a 137-page Memorandum of Proposed

Findings of Fact and Conclusions of Law.  Adv. Proc. No. 18-1025-GLT, ECF No. 248.

Therein, Judge Taddonio meticulously outlined and evaluated the parties' respective theories

concerning liability and damages.  An abbreviated summary of Judge Taddonio's thorough

analysis follows.

### (i)      Liability

In Count I of their operative complaint, Plaintiffs alleged that FireTech breached the

construction contract by abandoning the restoration project before work was completed.  The

Bankruptcy Court agreed with Plaintiffs that FireTech breached the contract by unjustifiably

walking off the job.  The Bankruptcy Court rejected Defendants' argument that FireTech's walk-

off was excused by Plaintiffs' prior breach of the contract's payment terms.  Specifically, the

Court found that Plaintiffs had no obligation to make progress payments under the contract, and certainly not in an amount that Defendants had charged, which amount exceeded the contract sales price. *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 93-102.

On the other hand, the Bankruptcy Court rejected Plaintiffs' theory that FireTech separately breached a so-called "completion agreement."  According to the Gruvers, this agreement arose when Randy promised to complete the project within 60 days (i.e. on or around February 11, 2018) if MetLife released $80,000 in additional funds.  The Bankruptcy Court opined that no such independent "agreement" existed, as the Gruvers did not prove that both FireTech and MetLife intended for FireTech to be contractually bound in this respect. *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 102-03.

In Count II of their pleading, the Gruvers alleged violations of both the HICPA and the UTPCPL.  As to the first statute, the Gruvers claimed that Defendants violated two provisions, *to wit*: (i) Section 517.9(5), which prohibits a person from "[a]bandon[ing] or fail[ing] to perform, without justification, any home improvement contract or project engaged in or undertaken by a contractor," and (ii) Section 517.9(6), which prohibits a person from "[d]eviat[ing] from or disregard[ing] plans or specifications, in any material respect, without a written change order dated and signed by both the contractor and owner, which contains the accompanying price changes for each deviation."

The Bankruptcy Court first determined that a violation of Section 517.9(5) of HICPA occurred when FireTech abandoned the Gruvers' project without justification.  The Bankruptcy Court next determined that Defendants violated section 517.9(6) of HICPA by deviating from the project specifications set forth in Exhibit A to the contract through various horse-trades that were

not documented in written change orders.  *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 105-07.

With respect to Plaintiffs' allegations of home improvement fraud, the Bankruptcy Court concluded that those allegations were not actionable through Section 517.8(a)(1) of HICPA, which defines a criminal offense.  Adv. Proc. 18-1025-GLT at ECF 248, p. 107.  Nevertheless, the Court found that the alleged home improvement fraud was theoretically actionable under the UTPCPL.  *Id.*  Specifically, the Bankruptcy Court considered whether the evidence supported a finding that Defendants had violated the UTPCPL's "catch-all" provision, which makes it unlawful to engage in "any fraudulent or deceptive conduct" that "creates a likelihood of confusion or of misunderstanding."  73 Pa. Stat. Ann. §201-2(4)(xxi); *see also id*., §201-3 (declaring acts described in §201-2(4) unlawful).  Upon a review of the record, the Bankruptcy Court found that "the Defendants engaged in numerous instances of both fraudulent and deceptive conduct in order to derive as much profit as possible from the project by either securing an agreement for additional paid work or otherwise justifying an increase in the Contract Sales Price."  Adv. Proc. 18-1025-GLT at ECF 248, p. 112.  In particular, the Bankruptcy Court found that FireTech and/or Randy Kincaid:

- sought to increase the Contract Sales Price by encouraging horse-trades that induced the Gruvers to abandon the scope of work originally outlined in Exhibit A to the contract while hiding the actual cost and scope of the (expanded) project;

- engaged in deceptive billing practices by unjustifiably demanding progress payments that were not due under the terms of the contract;

- submitted invoices that lacked any details to allow the Gruvers to discern how the cost for "services rendered" had been calculated, especially with respect to the final invoice; and

- falsely represented to MetLife and Plaintiffs that supplemental insurance proceeds would be sufficient to complete the project.

14

*Id.* at 112-18.

In Count III of their pleading, Plaintiffs alleged that Defendants breached the contract in a variety of ways related to the quality of their performance.  As an initial point, the Bankruptcy Court determined that there was no basis for imposing liability on Randy Kincaid personally, as he was not a signatory to the contract.  See Adv. Proc. 18-1025-GLT, ECF No. 248 at 119.  On the other hand, insofar as Count III was directed at FireTech, the Bankruptcy Court found that FireTech had breached the contract in two ways.  First, the Court found that FireTech breached its contractual obligation to comply with applicable laws by violating HICPA and UTPCPL.  *Id.* at 124.  Second, the Bankruptcy Court found that FireTech breached its obligation to negotiate with MetLife in good faith; this breach was predicated on Randy Kincaid's false representation to MetLife in December 2017 that FireTech could complete the project with the additional $80,000 in insurance proceeds that MetLife agreed to release.  *Id.* at 125.

Judge Taddonio opined that Plaintiffs' remaining claims against FireTech should be rejected.  To the extent Plaintiffs alleged contractual breach based upon FireTech's failure to perform services in a "good and first-class workmanlike manner," the Bankruptcy Court concluded that no such breach could be established in the absence of expert testimony.  *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 119-22.  To the extent the Gruvers alleged contractual breach arising out of FireTech's performance of work that exceeded the scope of the contract, the Bankruptcy Court found no basis to impose liability because the Gruvers had requested or agreed to all of the alleged project deviations.  *Id*. at 122-23.  To the extent Plaintiffs alleged contractual breach based upon FireTech's failure to secure a building permit as required by local ordinance, the Bankruptcy Court found that the Gruvers had not demonstrated a resulting injury.  *Id.* at 123-

15

24.  To the extent Plaintiffs alleged breach based on FireTech's failure to "work with reasonable diligence," the Bankruptcy Court found that the evidence did not support Plaintiffs' putative theories.  *Id.* at 125.

The Bankruptcy Court next addressed Plaintiffs' claim for alleged tortious interference with the administration of a bankruptcy estate, as set forth in Count IV of their pleading.  The court opined that this "novel" cause of action should be rejected on the grounds that only Congress could create such a claim and, because it has not done so, the claim in Count IV is not cognizable under federal law.  In any event, the court concluded such a claim is redundant of the protections already provided to a debtor's estate under the Bankruptcy Code.  *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 126-28.

In sum, the Bankruptcy Court recommended that judgment be entered in favor of Plaintiffs and against FireTech on Counts I, II, and III of the complaint, judgment be entered in favor of Plaintiffs as against Randy Kincaid relative to Count II of the complaint, judgment be entered in favor of both Defendants as to Count IV of the complaint, and judgment be entered in favor of Randy Kincaid as to Count III of the complaint.  *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 137.

### (ii) Damages

The Bankruptcy Court next addressed the issue of damages.  Turning first to the breach of contract claim, the Bankruptcy Court observed that the remedies afforded under Pennsylvania law for breach of contract are generally designed to protect one of three interests, *to wit*:

> a party's *expectation interest* by attempting to put him in as good a position as he would have been had the contract been performed, that is, had there been no breach; his *reliance interest* by attempting to put him back in the position in which he would have been had the contract not been made; or his *restitution interest* by requiring

the other party to disgorge the benefit he has received by returning it to the party who conferred it.[ ]

Adv. Proc. 18-1025-GLT, ECF No. 248 at 129 (quoting *Trosky v. Civil Serv. Comm'n City of Pittsburgh*, 652 A.2d 813, 817 (Pa. 1995) in a footnote) (Bankruptcy Court's emphasis added). The court noted the general rule that "the correct 'measure of an owner's damages for a construction contractor's breach is the cost of completing the contract or correcting the defective work, minus the unpaid part of the contract price.'" *Id*. at 130 (quoting *Oelschlegel v. Mut. Real Estate Inv. Tr.*, 633 A.2d 181, 184 (Pa Super. Ct. 1993)).

Turning next to the UTPCPL, the Bankruptcy Court observed that the statute allows courts to "'award up to three times the actual damages sustained, but not less than one hundred dollars" for a violation.  Adv. Proc. 18-1025-GLT, ECF No. 248 at 130 (quoting *Schwartz v. Rockey*, 932 A.2d 885, 897-98 (Pa. 2007)).  See 73 Pa. Stat. Ann. §201-9.2(a).  A court may also "provide such additional relief as it deems necessary or proper," including an award of "costs and reasonable attorney fees."  *Id*.

Judge Taddonio then set about attempting to quantify Plaintiffs' damages, pointing out that, "through no fault of the Gruvers, *the metric for project completion in this case is not ascertainable*."  See Adv. Proc. 18-1025-GLT, ECF No. 248 at 131 (emphasis in the original). Although the imprecise scope of the restoration project complicated Judge Taddonio's effort to assess damages, it did not render a damages quantification impossible.  "[T]he challenge," he acknowledged, was "to find a 'reasonable computation' of damages based on the evidence and 'considering the nature of the transaction.'"  *Id.* at 132 (quoting *Weinglass v. Gibson*, 155 A. 439, 440 (Pa. 1931)).

Ultimately, Judge Taddonio concluded that the most reasonable, albeit imperfect, way to calculate the Gruvers' damages was to assess the amount by which FireTech was overpaid based on Ryan Kincaid's estimation of how much work had been completed.  Judge Taddonio reasoned that this method of calculation

> strikes an appropriate balance between the competing interests of discerning the Gruvers' injury and recognizing that FireTech's services added value. Moreover, given that FireTech was not entitled to any payment until the project was finished, holding the Defendants to Ryan's completion estimate affords them completely proportional compensation. This also recognizes the Contract's admonition that the Contract Sales Price was a "lump sum" and not based on per item costs in Exhibit A.

*See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 133.  Acknowledging that Ryan Kincaid estimated the project was somewhere between 65 and 70 percent completed, "give or take 5%," the Bankruptcy Court adopted the bottom range of this estimate and assumed that the project was only 60 percent complete.  *Id.* at 133-34 (citation to the record omitted).  The Bankruptcy Court arrived at this figure based on Judge Taddonio's assessment that Ryan Kincaid was not personally involved in the construction, was "not . . . particularly credible," and had almost certainly overstated the percentage of work completed by FireTech.  *Id.*  The Bankruptcy Court next determined that, "if the project is 60% complete, FireTech would have earned no more than $108,575.03 [*i.e.*, 60% of $180,958.39, which was the final contract price].[ ] The parties have stipulated that FireTech was paid $152,216.06,[ ] meaning that the overpayment was $43,641.03."  *Id.* at 134 (footnotes omitted).  Thus the Bankruptcy Court opined that the Gruvers' damages from overpayment were $43,641.03.  *Id.* at 134.

The Bankruptcy Court next considered Plaintiffs' entitlement to consequential damages. Noting that their proof on this element of damages had been "sparse," Adv. Proc. 18-1025-GLT, ECF No. 248 at 134, the Bankruptcy Court found that only the costs of Plaintiffs' roll-off storage

containers and storage unit could be counted as reasonably certain consequential damages. The Court calculated that these damages amounted to $5,211 [i.e., ($136 + $57) x 27 months]. *Id.* at 135-36 and n. 812.

Turning next to the issue of statutory damages, the Bankruptcy Court observed that the Gruvers' damages for the breaches of contract were generally coextensive with their damages arising from Defendants' violations of HICPA and the UPTCPL. Adv. Proc. 18-1025-GLT, ECF No. 248 at 136. The Court found one area, however, where Defendants' statutory damages gave rise to additional damages, *to wit*:

> The exception is the Defendants' fraudulent conduct at the December 2017 meeting induced the Gruvers to release MetLife from any claims arising from the fire. As a result, the Gruvers gave up the $1,100 per month stipend that compensated them for the loss of use of their property. Accordingly, the Gruvers may recover an additional $29,700 [*i.e.*, $1,100 times 27 months] based on the Defendants' fraud.

*Id.*; *see also* n. 814.

In sum, the Bankruptcy Court found that Plaintiffs had proven actual damages in the total amount of $78,552.03, comprised of $43,641.03 in overpayment damages, $5,211 in consequential damages, and $29,700 related to Defendants' fraud. *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 136 and n. 815. The Bankruptcy Court further opined that a statutory enhancement of damages was warranted because of the extent and severity of the Defendants' fraudulent and deceptive conduct and the fact that their violations of HICPA went "to the very heart of the problems in this case[.]" *Id*. at 136. The court opined that a doubling of damages was appropriate, resulting in a suggested damages award of $157,104,06.

### (iii) Attorneys' Fees and Expenses

As noted, the UTPCPL allows an award of reasonable attorney fees. *See* 73 Pa. Stat. Ann. §201-9.2(a). The Court determined in its June 19, 2020 Memorandum of Proposed

Findings of Fact and Conclusions of Law that an award of attorney fees would be appropriate in this case, in addition to damages. To that end, it directed Plaintiffs to file a statement of attorneys' fees and allowed Defendants an opportunity to respond. Adv. Proc. 18-1025-GLT, ECF No. 251.

Plaintiffs submitted their Statement of Attorneys' Fees on June 29, 2020. Adv. Proc. 18-1025-GLT, ECF No. 253. Defendants filed their Objections to Plaintiffs' Statement of Attorneys' Fees on July 20, 2020. Adv. Proc. 18-1025-GLT, ECF No. 257. Ultimately, the parties were only $858.60 apart in light of the Plaintiffs' agreement to waive a certain portion of their attorney fees. *See* Adv. Proc. 18-1025-GLT, ECF No 260 at 3. The Bankruptcy Court concluded that an award of the disputed $858.60 could be justified based on the amount of time that Plaintiffs' counsel reasonably spent preparing his fee application in the within adversary action. The remainder of the requested fees and expenses being unchallenged, the Bankruptcy Court recommended that Plaintiffs be awarded costs and counsel fees in the total amount of $53,665.78. *Id.* at 4. Judge Taddonio issued this recommendation in a Supplemental Memorandum of Proposed Findings of Fact and Conclusions of Law Regarding the Award of Reasonable Attorney's Fees, filed on July 24, 2020. *See* Adv. Proc. 18-1025-GLT, ECF No. 260.

### 4.  The Parties' Objections

In July 2020, the parties filed their respective objections to the Bankruptcy Court's June 19, 2020 Memorandum of Proposed Findings of Fact and Conclusions of Law. Defendants assert the following objections:  (1) the Bankruptcy Court lacked sufficient and competent facts to support its proposed assessment of damages; (2) the Bankruptcy Court's proposed finding that FireTech was not entitled to the money held in the Ocwen account improperly creates a windfall

to Plaintiffs; (3) the Bankruptcy Court erred as a matter of law in finding that Randy Kincaid is

personally liable to Plaintiffs; and (4) the Bankruptcy Court erred in concluding that it possessed

subject matter jurisdiction over this proceeding. *See* Adv. Proc. 18-1025-GLT, ECF No. 259.

Plaintiffs registered two objections: first that the unapplied insurance proceeds held by Ocwen

should be remitted back to them or to the Chapter 13 Trustee to fund their plan and, second, that

treble damages are appropriate and would not produce an unjust windfall for them. *Id.* at 258.

Both sides have had an opportunity to respond to the pending objections. *See* Adv. Proc.

18-1025-GLT, ECF No. 263, 264. This Court being in receipt of the Bankruptcy Court's

proposed findings of fact and conclusions of law, the parties' respective objections thereto and

responses to objections, and relevant parts of the Bankruptcy Court record, the matter is ripe for

review.

## III.    STANDARD OF REVIEW

Once a bankruptcy court determines that a pending matter is not a core proceeding under

28 U.S.C. § 157(b)(2) but is nonetheless related to a case under title 11, it shall submit proposed

findings of fact and conclusions of law to the district court. *See* 28 U.S.C. § 157(c)(1).

Thereafter, "any final order or judgment shall be entered by the district court judge after

considering the bankruptcy judge's proposed findings and conclusions and after reviewing de

novo those matters to which any party has timely and specifically objected." *Id*. Federal Rule of

Bankruptcy Procedure 9033 provides that:

> The district judge shall make a de novo review upon the record or, after additional
> evidence, of any portion of the bankruptcy judge's findings of fact or conclusions
> of law to which specific written objection has been made in accordance with this
> rule. The district judge may accept, reject, or modify the proposed findings of fact
> or conclusions of law, receive further evidence, or recommit the matter to the
> bankruptcy judge with instructions.

Fed. R. Bankr. P. 9033(d).

## IV.    DISCUSSION

### A.  Defendants' Objection as to Jurisdiction

We first address Defendants' argument that the Bankruptcy Court erred in concluding that it had subject matter jurisdiction over this adverse action. "Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006), *as amended* (Mar. 17, 2006) (citing 28 U.S.C. § 1334(b) and *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004) (citations omitted)). "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F. 3d 154, 162 (3d Cir. 2004)).

"[A] claim falls within the bankruptcy court's 'related to' jurisdiction if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (internal quotations and citations omitted).  Conversely, "bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor."  *Celotex Corp. v. Edwards (In re Celotex),* 514 U.S. 300, 308 n. 6 (1995).

In this case, Defendants challenge the Bankruptcy Court's determination that it had "related to" jurisdiction over the instant proceeding.  Defendants note that, where -- as here -- the adverse proceeding arises post-confirmation, "related to" jurisdiction requires that the underlying

22

claims "affect an integral aspect of the bankruptcy process -- there must be a close nexus to the bankruptcy plan or proceeding." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004). "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id*.

Defendants posit that the outcome of this litigation can have no possible impact on the Plaintiffs' Chapter 13 plan because the Gruvers' confirmed plan does not call for application of the proceeds of this proceeding to fund the plan, the confirmed plan does not call for the liquidation of assets at issue in the adversary proceeding, and the Chapter 13 Trustee has not intervened in this adversary proceeding. Nor, Defendants posit, will this action have any bearing on the Gruvers' ability to consummate their confirmed plan, on the distributions to creditors in this case, or on the allowance or disallowance of claims against the estate. Because this proceeding involves only state law breach of contract and consumer protection claims, Defendants contend that it should be dismissed and litigated in the state Court of Common Pleas. As support for their position, Defendants refer the Court to *In re Shuman,* a Chapter 13 case in which the bankruptcy court determined that it lacked jurisdiction to hear the debtors' state-law claims against their prior bankruptcy counsel, which arose post-confirmation. *See* 277 B.R. 638 (Bankr. E.D. Pa. 2001).

Defendants' objections in this regard are not well-taken. The Gruvers' plan in the underlying Chapter 13 proceedings, as confirmed on May 23, 2017, requires monthly payments of $2,255. *See* Case No. 16-10241-TPA, ECF No. 83. Mr. Gruver has credibly testified that Plaintiffs have been unable to make their required payments as a result of being displaced from their home and incurring extra expenses. Adv. Proc. 18-1025-GLT, ECF No. 224 at 124:15-23. Moreover, Judge Agresti, who is presiding over Plaintiffs' ongoing Chapter 13 proceedings,

23

entered an interim order decreasing the amount of Plaintiffs' monthly payments in response to the hardship that Defendants' actions have imposed on them, although the total amount of Plaintiffs' Chapter 13 plan obligation evidently has not changed and their arrearages continue to accumulate. *See* Case No. 16-10241-TPA, ECF No. 135. As Plaintiffs also point out, under the terms of their plan, the "Property of the estate shall not re-vest in the Debtor(s) until the bankruptcy case is closed." *Id*. at ECF 41. Therefore, the Gruvers' residence remains the most valuable asset of the estate, but it has not been restored to a habitable condition and its present value is diminished. Plaintiffs further note that the terms of their plan allow holders of unsecured claims to obtain payment of the entirety of their allowed claims. Because the successful administration of Plaintiff's plan appears to hinge on the outcome of this litigation, the Court finds that the requisite nexus exists between the present litigation and the underlying Chapter 13 proceedings to satisfy the demands of "related to" jurisdiction. *See also Hous. Auth. of Beaver Cty. v. Alberts (In re Alberts),* 381 B.R. 171, 181 (Bankr. W.D. Pa. 2008) ("[T]here is a presumption in personal bankruptcies that a chapter 13 debtor's residence is necessary for an effective reorganization when the purpose of filing for Chapter 13 is to retain possession of the debtor's home.") (citation omitted). The Court is not persuaded by Defendants' reliance on *In re Shuman,* as the facts in that case are distinguishable and did not involve the same considerations discussed herein. Accordingly, Defendants' jurisdictional objections are overruled.

B. *The Parties' Respective Objections Concerning Damages*

1. <u>Defendants' Objection that the Damages Award is Erroneous and Unsupported</u>

The Court next considers Defendants' objection that the recommended award of damages is erroneous as a matter of law and unsupported by the evidence. In brief, Defendants argue that

24

the Bankruptcy Court could not determine the amount of work that remained unperformed by FireTech without the benefit of expert testimony, and no such testimony was presented at trial. While the Bankruptcy Court relied on Ryan Kincaid's estimate concerning the percentage of work that had been completed, Defendants insist this was error because Ryan was presented only as a fact witness.  In that capacity, Defendants argue, Ryan Kincaid could not, and did not, render the necessary expert opinion.  Moreover, Defendants portray Ryan's assessment of the percentage of work completed as "pure conjecture," because he had no independent knowledge of what was finished on the project.  Adv. Proc. 18-1025-GLT, ECF No. 259, ¶26.  Defendants insist that this does not leave the Plaintiff without a remedy because the Gruvers could still recover their proven consequential damages.

Having given full consideration to Defendants' arguments, the Court finds them unpersuasive.  Here, the Bankruptcy Court accurately stated the controlling principles of Pennsylvania law on recovery of damages, *see* Adv. Proc., ECF No. 248 at 128-129, which the Pennsylvania Superior Court recently summarized thusly:

> "Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." *Bailets v. Pennsylvania Turnpike Commission*, 181 A.3d 324, 336 (Pa. 2018). "It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss." *Witherspoon v. McDowell-Wright*, 241 A.3d 1182, 1188 (Pa. Super. 2020) (quoting *Delahanty v. First Pennsylvania Bank, N.A*., 464 A.2d 1243, 1258 (Pa. Super. 1983)). Although the evidence does not require mathematical precision, a plaintiff must put present "sufficient facts" such that the fact-finder "can arrive at an intelligent estimate [of damages] without conjecture." *Id*. (quoting *Delahanty*, 464 A.2d at 1257-58). "[T]he test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages[; t]hus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount." *Logan v. Mirror Printing Co. of Altoona, Pa*., 600 A.2d 225, 227 (Pa. Super. 1991) (citation and emphasis omitted).

*BBB Indus., LLC. v. Cardone Indus., Inc*., No. 3003 EDA 2019, 2022 WL 1088247, at *4 (Pa. Super. Ct. Apr. 12, 2022) (alterations in the original); *see also Mass Bonding & Ins. Co. v. Johnston & Harder,* 22 A.2d 709, 713 (Pa. 1941) ("'Where there is a basis in the evidence for a reasonable computation of the damages suffered considering the nature of the transaction, a verdict may be based thereon, though there may be involved some uncertainty about it.'") (quoting *Weinglass v. Gibson*, 155 A.439, 440 (Pa. 1931)).

Here, there is ample evidence to establish that the Gruvers were harmed as a result of the Defendants' wrongful conduct.  Thus, the *fact* of damages is not speculative.  And, considering "the nature of the parties' transaction," *Mass Bonding & Ins. Co.,* which included an extensive degree of undocumented horse-trading, Ryan Kincaid's estimate as to the degree of project completion constituted a reasonable basis for the Bankruptcy Court's proposed calculation of overpayment damages.  To be sure, Ryan's testimony in this regard suffered from credibility issues, as the Bankruptcy Court acknowledged.  Not only was Ryan uninvolved in the actual construction work, but he is also aligned with the Defendants' interests in this case although not himself a named party; therefore, he has a motive to overestimate the amount of work completed by FireTech and underestimate the amount of work that remained.  However, the Bankruptcy Court adequately accounted for Ryan's diminished credibility by assuming that his estimate of completed work was overstated and adopting a figure at the bottom range of Ryan's estimate.

Defendants contend that Ryan was precluded under the Federal Rules of Evidence from offering any opinion on the degree of project completion, given his status as a lay witness.  But lay witnesses are not precluded from opining on matters involving particularized knowledge that the witness acquires by virtue of his or her position in a business.  *See* Fed. R. Evid. 701 and Advisory Committee Notes to Fed. R. Evid. 701 (2000 Amendments); *see also Lightning Lube,*

26

*Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (court did not abuse its discretion in permitting the plaintiff owner to give lay opinion testimony as to damages that was based on his knowledge and participation in the day-to-day affairs of the business).  Although Ryan Kincaid may not have been personally involved in the construction aspects of the Gruvers' home restoration project, he was involved in drawing up work estimates and sending Plaintiffs periodic invoices for completed work based on information he received in his capacity as operations manager.  *See* Adv. Proc. 18-1025-GLT, ECF 225 at 79:9-17, 80:1-3, 10-18.  Ryan was also familiar with the project to the extent he had been on the premises in December 2017 for the purpose of preparing a supplemental estimate of work to be performed.

In any event, the lack of a more precise damages calculation is largely the result of Defendants' practice of engaging in undocumented horse-trading without any cost analysis, which served to significantly muddle the scope of the project.  As the Bankruptcy Court observed, this was not the fault of the Gruvers and would have complicated the Court's damages calculation even if the Court had the benefit of expert testimony.  Adv. Proc. 18-1025-GLT, ECF No. 248 at 131, n. 795.  Under Pennsylvania law, the Defendants should not benefit from the fact that their tortious conduct and/or contractual breach also made an assessment of the resulting damages more difficult.  *See, e.g., Osterling v. Frick,* 131 A. 250, 251 (Pa. 1925) ("One injured by the default of another will not be denied redress where his damages therefrom are shown approximately, although with less certainty because of injury of like character inflicted upon him by the acts of others.").

On balance, the Court is satisfied that Ryan Kincaid's testimony was admissible and provides a sufficient factual basis from which the Court can intelligently estimate the amount of Plaintiffs' overpayment to FireTech.  Though not perfect, this measure of damages is not

27

impermissibly speculative and is the most reasonable method of calculating the Gruvers' loss, considering the nature of the parties' underlying transaction.  As the Bankruptcy Court pointed out, it accounts for the value of FireTech's work on the project and affords Defendants proportionate compensation for that work.  It also comports with the provision in the contract recognizing that the contract sales price was intended to be a "lump sum contract price" for all the services listed in Exhibit A.  See Ex. BB, ¶7.  Defendants' objection to the contrary is therefore overruled.

2.  Plaintiffs' Objection that the Court Should Award Treble Damages

As discussed, the UTPCPL allows courts to "'award up to three times the actual damages sustained, but not less than one hundred dollars" for a violation.  Adv. Proc. 18-1025-GLT, ECF No. 248 at 130 (quoting *Schwartz v. Rockey*, 932 A.2d 885, 897-98 (Pa. 2007)).  *See* 73 Pa. Stat. Ann. §201-9.2(a).  Here, after finding that Plaintiffs had established actual damages in the amount of $78,552.03, the Bankruptcy Court opined that a doubling of damages, rather than trebling, would be a more appropriate remedy in this case.  Accordingly, the court recommended that Plaintiffs be awarded $157,104.06 in damages.

Plaintiffs object to this aspect of the Bankruptcy Court's proposed findings of fact and conclusions of law.  They argue that no arbitrary windfall would result from trebling damages (which would produce an award of $235,656.09), because they may require funds totaling as much as $131,810.36 to complete their chapter 13 plan in the future and will also have to bear the full cost of restoring the house from its presently uninhabitable state.

This Court appreciates Plaintiffs' concerns but, like Judge Taddonio, this Court finds that a doubling of Plaintiff's damages strikes the appropriate balance in this case.  On one hand,

28

the award furthers the remedial purposes of the UTPCPL by accounting for Defendants'
fraudulent and deceptive conduct.  On the other hand, it avoids the risk of a potentially
unjustified windfall for Plaintiffs or a penalty for Defendants that is unduly severe.
Consequently, Plaintiffs' objections to the proposed award of doubled damages will be
overruled.

    C. *The Parties' Objections Concerning Unapplied Insurance Proceeds*

The parties lodge competing objections concerning unapplied insurance proceeds that are
apparently still being retained by Ocwen.[3]  Defendants take the position that the proceeds should
be credited in their favor.  They posit that the funds were intended for the completion of the
project and, in not crediting that sum to FireTech, the Bankruptcy Court awarded Plaintiffs a
windfall and incorrectly reached a finding of fact as to the sum of damages owned Plaintiffs.

Plaintiffs, on the other hand, argue that the unapplied insurance proceeds held by Ocwen
should be remitted to the Trustee and applied to the Estate.  Plaintiffs acknowledge that this issue
presents "an apparent loose end of the parties' creation," Adv. Proc. 18-1025-GLT, ECF No. 258
at 1, as Plaintiffs previously divested themselves of their insurance claim and there is "'no
contractual mechanism to give those rights back'" to them.  Adv. Proc. 18-1025-GLT, ECF No.
258 at 2 (quoting ECF 248 at 100).  Arguing that Defendants have no equitable claim to the
funds, the Gruvers seek an order directing an appropriate disposition either to the Chapter 13
Trustee or to themselves.

---

[3] Although the Bankruptcy Court estimated those funds as totaling approximately $37,000, *see*
Adv. Proc. 18-1025-GLT, ECF No. 248 at 49, n. 357, Plaintiffs suggest that the total remaining
funds may be $36,254.55.

The Court agrees that the unapplied insurance proceeds being held by Ocwen should be remitted to the Gruvers and not to Defendants. While it is true that the funds were previously assigned to FireTech by the Gruvers and intended as payment for completion of the project, the Bankruptcy Court correctly concluded that FireTech could have no valid claim to the funds once it materially breached the contract by abandoning the project without justification. *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 133, n. 800. Ultimately, consistent with the Bankruptcy Court's proposed damages calculation, FireTech will retain payments totaling $108,575.03, and Plaintiffs will have received approximately $108,575.03 worth of services from FireTech. The Bankruptcy Court also correctly determined that, with no more than 60 percent of the project completed, FireTech had already been overpaid by approximately $43,641.03.

Remitting the unapplied insurance proceeds back to the Gruvers will not produce a windfall, as the Gruvers will have to incur the future expenses associated with obtaining the full restoration of their house.[4] The other damages assessed against Defendants will not result in an unfair windfall to Plaintiff as they are intended to address other elements of Plaintiff's losses and injuries. Accordingly, the Court will direct that the remaining proceeds released by MetLife and held by Ocwen be remitted to the Gruvers.

---

[4] As discussed by the Bankruptcy Court, the evidence at trial suggested that the Gruvers' home may be incurring additional damage, as there is evidence that water has been entering the basement and certain windows are not properly sealed. *See* Adv. Proc. 18-1025-GLT, ECF No. 248 at 46. In certain areas of the house, there exists a discernable "sag" in the floor and, according to Mr. Gruver, parts of the floor are warped from taking on water. *Id*. at 48. Thus, it seems likely that the Gruvers will be required to pay amounts in excess of the contract price in order to properly restore their home, particularly in light of Randy Kincaid's statement that the project was "underwater."

### D. *Personal Liability of Randy Kincaid*

Defendants next object to the Bankruptcy Court's recommendation that judgment be entered against Randy Kincaid with respect to the UTPCPL claim in Count II of the Second Amended Adversarial Complaint.  According to Defendants, no UTPCPL or HICPA claim was ever asserted against Randy Kincaid until post-trial briefs were filed.  Defendants therefore posit that holding Randy liable for violations of the UTPCPL and/or HICPA would violate his due process rights and constitute an error of law. Alternatively, Defendants argue that the Bankruptcy Court erred in not applying a showing of fraud under the UTPCL.

The essence of due process is adequate notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *see Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015).  Here, any suggestion that Randy Kincaid was denied due process or that he was subjected to trial by ambush is belied by the record in this case.  As Plaintiffs correctly point out, their operative pleading sets forth numerous causes of action under the heading "Claims Against FireTech and Randy Kincaid."  Adv. Proc. 18-1025-GLT, ECF No. 49 at 7.  Count II, in particular, states alleged violations of the HICPA and UTPCPL and specifically avers that "Firetech and Randy Kincaid, individually, have made numerous false or misleading statements; . . . ." Id., ¶95.  The complaint goes on to detail various acts and statements attributed to Randy Kincaid that form the basis of the claim.  *See id.*, ¶¶ 95-116.  And the *ad damnum* clause in Count II contains a prayer for damages without any language to suggest that the relief is being sought only against FireTech.  *Id*. at p. 15.  Plaintiffs also point to defense counsel's acknowledgement at trial that he was defending four distinct claims against FireTech and Randy Kincaid. Adv. Proc. 18-1025-GLT, ECF No. 224 at 8:10-13.  Notably, defense counsel did not seek to have Randy dismissed from the litigation after the Bankruptcy Court dismissed the claim

31

against him for alleged tortious interference with the administration of a bankruptcy estate.  *See* Adv. Proc. 18-1025-GLT, ECF No. 225 at 36:9-37:11.

Whereas liability under Plaintiffs' breach of contract claims is logically restricted to FireTech (the only Defendant that was party to the contract), there is no similar legal basis for excluding Randy Kincaid from liability under Count II.  Thus, after observing that Plaintiffs' contractual damages were generally coextensive with their statutory damages, the Bankruptcy Court concluded that "Randy is ultimately no less liable than FireTech" for Plaintiffs' statutory damages, "even though he has no personal liability on [the breach of contract claims in] Counts I and III."  Adv. Proc. 18-1025-GLT, ECF No. 248 at 136, n. 813.  Because this Court agrees that Randy Kincaid may properly be held liable under Count II of the Plaintiff's Second Amended Adversarial Complaint, and because this Court agrees with the Bankruptcy Court's recitation and application of the relevant legal standard for liability under Count II, Defendants' objection on this point is overruled.

### E.  Attorneys' Fees and Expenses

As noted, on July 24, 2020, Judge Taddonio issued a Supplemental Memorandum of Proposed Findings of Fact and Conclusions of Law Regarding the Award of Reasonable Attorney's Fees.  Adv. Proc. 18-1025-GLT, ECF No. 260.  Therein, he recommended that this court grant the Gruvers' request for attorney's fees in the amount of $50,999 and expenses in the amount of $2,666.78 in expenses, for a total award of $53,665.78.

Defendants initially opposed any award for certain itemized fees and expenses which totaled $11,617.60 but, because the Gruvers had separately waived any claim for counsel fees that were disallowed by the Bankruptcy Court in the main Chapter 13 case (totaling $10,759),

32

the amount in controversy ultimately boiled down to $858.60.  As discussed, Judge Taddonio found that an award of the disputed $858.60 was warranted based on the amount of time that Mr. Robleto spent preparing the fee application in this adversary proceeding (i.e., 2.7 hours at a rate of $320.00 per hour).

Defendants did not lodge any further objection to Judge Taddonio's recommended award of fees and expenses in the total amount of $53,665.78.  Accordingly, upon *de novo* review of the parties' respective filings as well as Judge Taddonio's supplemental memorandum, the Court agrees that an award of attorney's fees in the amount of $50,999 and expenses in the amount of $2,666.78 is reasonable and appropriate.

## V.     CONCLUSION

Based upon the foregoing reasons, after *de novo* review of the filings and the evidentiary record in this case, the Court will adopt the Bankruptcy Court's Memorandum of Proposed Findings of Fact and Conclusions of Law, and its Supplemental Memorandum of Proposed Findings of Fact and Conclusions of Law Regarding the Award of Reasonable Attorney's Fees. See Adv. Proc. 18-1025-GLT, ECF Nos. 248 and 260.  The parties' respective objections to the Bankruptcy Court's Memorandum are overruled.

Judgment will be entered in favor of the Gruvers against FireTech with respect to Counts I, II, and III of the Second Amended Adversarial Complaint.  Judgment will also be entered in favor of the Gruvers and against Robert "Randy" Kincaid relative to Count II of the Second Amended Adversarial Complaint.  Judgment against these Defendants will be joint and several in the amount of $157,104.06.  With respect to Count II of the Second Amended Adversarial

33

Complaint, the Court will award Plaintiffs costs and reasonable attorney's fees in the amount of $53,665.78.

Judgment will be entered in favor of FireTech and Randy Kincaid, and against the Gruvers, with respect to Count IV of the Second Amended Adversarial Complaint.  Judgment will be entered in favor of Randy Kincaid, and against the Gruvers, with respect to Count III.

Finally, the Court will order Ocwen Loan Servicing, LLC to remit any unapplied insurance proceeds to Plaintiffs.

An appropriate Order of Judgment follows.

Susan Paradise Baxter
United States District Judge